# IN THE SUPREME COURT OF CALIFORNIA

VENTURA COUNTY EMPLOYEES' RETIREMENT
ASSOCIATION,
Plaintiff and Respondent,

v.

CRIMINAL JUSTICE ATTORNEYS ASSOCIATION OF
VENTURA COUNTY et al.,
Defendants and Appellants.

S283978

Second Appellate District, Division Six
B325277

Santa Barbara County Superior Court
VENCI00546574

July 27, 2026

Justice Kruger authored the opinion of the Court, in which
Justices Corrigan, Liu, Groban, Evans, and Boulware
Eurie[*]concurred.

Chief Justice Guerrero filed a concurring opinion.

---

[*]    Associate Justice of the Court of Appeal, Third Appellate
District, assigned by the Chief Justice pursuant to article VI,
section 6 of the California Constitution.

VENTURA COUNTY EMPLOYEES' RETIREMENT
ASSOCIATION v. CRIMINAL JUSTICE ATTORNEYS
ASSOCIATION OF VENTURA COUNTY

S283978


Opinion of the Court by Kruger, J.


In the California Public Employees' Pension Reform Act of 2013 (PEPRA; Stats. 2012, ch. 296, § 28; Gov. Code, § 7522 et seq.),[1] the Legislature imposed new limits on the types and amounts of employee compensation that county retirement systems may use as a basis to calculate retirement benefits of covered public employees. (*Alameda County*, *supra*, 9 Cal.5th at pp. 1059–1063; Gov. Code, § 31461, subd. (b) (section 31461).) The purpose of these limits was to reduce the practice of "pension spiking" — that is, "the manipulation of an employee's pattern of work and pay to produce inflated compensation earnable during the final compensation period" which, in turn,

---

[1] We use the acronym "PEPRA" to refer generally to Assembly Bill No. 340 (2011–2012 Reg. Sess.) (Assembly Bill No. 340), which enacted the amendment at issue in this case. (Stats. 2012, ch. 296, § 28 [adding § 31461, subd. (b)]; see Stats. 2012, ch. 297, § 2 [Assem. Bill No. 197; companion bill making technical changes to Assem. Bill No. 340 and PEPRA].) Assembly Bill No. 340, however, gave the formal title "California Public Employees' Pension Reform Act of 2013" only to newly added article 4 of chapter 21 of division 7 of title 1 of the Government Code, which covers sections 7522 to 7522.74 (Stats. 2012, ch. 296, § 15) governing new employees. (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1052, fn. 1 (*Alameda County*).)

results in greater pension obligations for participating counties. (*Alameda County*, at p. 1061.)

This case concerns one of these limits:  Under PEPRA, the pension calculation for certain public employees now must exclude payments an employee receives for unused vacation or other leave "in an amount that exceeds that which may be earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid." (§ 31461, subd. (b)(2) (section 31461(b)(2)).)  In *Alameda County*, we described one function of this provision as preventing employees from effectively doubling the amount of cashed out leave time they would ordinarily be able to receive in a single calendar year, under annual limits set by the terms of employment, by designating a final compensation year that straddles two calendar years.  (*Alameda County*, *supra*, 9 Cal.5th at pp. 1062–1063.)  This description was not essential to our holding in *Alameda County*, which primarily concerned PEPRA's constitutionality.  Nonetheless, the retirement system in Ventura County proposed to implement the law as *Alameda County* described it.  Now, facing opposition from county employees, the retirement system seeks confirmation that the opinion's understanding of section 31461(b)(2) is correct.

Reading the relevant statutory text in light of the purposes it was meant to achieve, we now confirm what we said about section 31461(b)(2) in *Alameda County*:  Under PEPRA, a public employee's retirement benefit calculation may not include cashed out leave time in excess of the applicable annual limit set by the terms of employment, even though the employee

2

has designated a final compensation period that straddles two or more calendar years.

## I.

Our opinion in *Alameda County* contains a comprehensive overview of the legal background to this appeal. (See *Alameda County*, *supra*, 9 Cal.5th at pp. 1055–1063.) In brief: This case, like *Alameda County*, concerns PEPRA's changes to the County Employees Retirement Law of 1937. (CERL; Gov. Code, § 31450 et seq.) CERL establishes an optional county employee pension system that has been adopted by some 20 of California's 58 counties. (*Alameda County*, at pp. 1055, 1066–1067.)[2] Under CERL, a retiring employee's pension benefit is calculated at the end of the employee's career, based on three variables: (1) age at retirement; (2) years of service; and (3) final compensation. (See Gov. Code, §§ 31676.01–31676.19; *Alameda County*, at p. 1056.) In this calculation, the employee's final compensation is "a critical factor": "All other things being equal, the greater an employee's final compensation, the greater will be the monthly pension benefit." (*Alameda County*, at p. 1057.)

The Legislature enacted PEPRA in 2012 as a " 'comprehensive' reform of California's public pension systems." (*Alameda County*, *supra*, 9 Cal.5th at p. 1059.) "Its centerpiece was a new pension plan applicable only to newly hired public employees" and designed to be less costly than pre-existing plans. (*Ibid.*) "But PEPRA also modified some statutes

---

[2] The other counties "either operate an independent retirement system or contract with the state's pension plan, the Public Employees' Retirement System (CALPERS; [Gov. Code,] § 20000 et seq.)." (*Alameda County*, *supra*, 9 Cal.5th at p. 1055.)

governing the pensions of existing employees" to achieve similar cost-saving ends. (*Ibid.*) Among other things, PEPRA changed how final compensation is calculated for so-called "legacy" plan members — *i.e.*, persons who were hired before PEPRA took effect on January 1, 2013. (*Alameda County*, at p. 1051.) Those changes are the provisions at issue here.

For legacy members, the post-PEPRA version of the statute defines final compensation as an employee's annual "compensation earnable" received during a specified time period.[3] That time period may consist of either one year (§ 31462.1) or three years (*id.*, § 31462), depending on the election of the county board of supervisors.[4] When employees

---

[3] The provisions discussed in this paragraph do not apply to those hired after PEPRA's effective date, generally referred to as "PEPRA members." (See Gov. Code, §§ 31462, subd. (b) [stating that the section does not apply to members subject to PEPRA]; 31462.1, subd. (b) [same]; see *Alameda County*, *supra*, 9 Cal.5th at p. 1055 ["Employees hired post-PEPRA are often subject to alternate statutory provisions"].) PEPRA members are instead subject to Government Code section 7522.34, which defines "pensionable compensation" as excluding all leave cashouts. (*Id.*, § 7522.34, subd. (c)(5) ["Pensionable Compensation" excludes "[p]ayments for unused vacation, annual leave, personal leave, sick leave, or compensatory time off, however denominated, whether paid in a lump sum or otherwise, regardless of when reported or paid"]; see *id.*, § 7522.48 ["Final Compensation"].)

[4] The default period is three years, but the county board of supervisors may instead elect the single-year alternative. (Gov. Code, §§ 31462, 31462.1, subd. (a)(2).) If the period is three years, then an employee's compensation earnable is averaged across the three years. (*Alameda County*, *supra*, 9 Cal.5th at p. 1057.)

retire, they may designate which one- or three-year period to use in calculating their "compensation earnable." (Gov. Code, §§ 31462, 31462.1; see *Alameda County*, *supra*, 9 Cal.5th at p. 1057, fn. 6; see *ibid.* [if the employee fails to choose, the final compensation period will include the year or years immediately preceding the employee's retirement].)

CERL defines " '[c]ompensation earnable' " as the employee's "average compensation . . . for the period under consideration upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay." (§ 31461, subd. (a); see *id.*, subd. (b) [listing exclusions].) This general concept of compensation earnable "is intended to reflect pay for work ordinarily performed during the course of a year," such that "[a]n employee becomes entitled to a greater pension benefit than his or her peers by being compensated at a higher rate" during the final compensation period used to calculate the amount of pension benefit. (*Alameda County*, *supra*, 9 Cal.5th at pp. 1063, 1096.) For purposes of this definition, "compensation" refers to the employee's "remuneration paid in cash out of county or district funds," including wages deducted for participation in a deferred compensation plan, "but does not include the monetary value of board, lodging, fuel, laundry, or other advantages furnished to a member." (Gov. Code, § 31460.)

Before PEPRA, CERL contained no express limits on what "remuneration paid in cash" was to be counted as the "compensation earnable" for purposes of determining an employee's pension benefit. We thus interpreted the statute to mean that, "[w]ith the exception of overtime pay, items of

'compensation' paid in cash, even if not earned by all employees in the same grade or class, must be included in the 'compensation earnable' and 'final compensation' on which an employee's pension is based." (*Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483, 487 (*Ventura County*); see *id.* at pp. 493–494 [addressing the meaning of the pre-PEPRA definition of "compensation earnable"]; see also *Alameda County*, *supra*, 9 Cal.5th at pp. 1085–1086, 1090 [reading *Ventura County* as adopting a "broadly inclusive definition" (italics omitted)].)

CERL's " 'very broad and general definition of' " compensation earnable (*Alameda County*, *supra*, 9 Cal.5th at p. 1095) allowed room for employees to manipulate their pattern of work to increase the amount of compensation earnable during the final compensation period. (*Id.* at p. 1061.) An employee might "considerably increase his or her pension benefit" by, for instance, "volunteering for a large quantity of on-call duty or by accumulating and cashing out a large quantity of unused leave time during the final compensation period. Because such enhancements are arguably inconsistent with the underlying concept of compensation earnable, which is intended to reflect pay for work ordinarily performed during the course of a year, these types of enhancement have been characterized as pension spiking." (*Id.* at p. 1063.)

To close perceived "loopholes" and to "bring the definition of 'compensation earnable' into closer alignment with the preexisting theory underlying CERL's determination of pension benefits," PEPRA amended section 31461 to exclude certain types of payments from the calculation of compensation

earnable.  (*Alameda County*, *supra*, 9 Cal.5th at p. 1095.) Specifically, PEPRA added subdivision (b) to exclude "any compensation determined by the local retirement board to have been paid to enhance a member's retirement benefit ([§ 31461], subd. (b)(1)) and any compensation for services rendered outside normal working hours (*id*., subd. (b)(3)).  In addition, compensation for the surrender of unused paid time off, such as vacation and sick leave, and payments made at termination of employment, which often also constitute compensation for unused leave time, can be included in compensation earnable only to the extent the leave time was 'earned and payable' in any 12-month period during a final compensation year.  [Fn. omitted.]  (§ 31461, subd. (b)(2) & (4).)" (*Alameda County*, at p. 1060.)

The issue in this case concerns the latter set of changes to calculations based on unused leave time.  Typically, "[w]hen annual leave is taken as time off, the employee simply continues to receive regular salary or wages without the necessity of performing services." (*Ventura County*, *supra*, 16 Cal.4th at p. 497; see *id*. at p. 489, fn. 11.)  When an employee accumulates leave time without taking time off, counties may allow employees to surrender the unused time for its value in cash. (See *Alameda County*, *supra*, 9 Cal.5th at p. 1062.)  Counties may, however, limit the amount of accumulated leave time that employees may convert to cash in a single year.  (See *ibid*.)  Under CERL, "[w]hen an employee elects to receive cash in lieu of accrued vacation and the wages or salary the employee would receive during the vacation period, the cash, like the vacation pay the employee would otherwise receive, is part of the employee's 'remuneration' for past services" and is

7

considered "compensation" for purposes of calculating pension benefits. (*Ventura County*, at pp. 497–498.) For legacy members, however, PEPRA now limits the amount of cashed out leave time that may be included as compensation earnable to that which is "earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid." (§ 31461(b)(2), added by Stats. 2012, ch. 296, § 28.)

In *Alameda County*, legacy members of county pension plans filed suit challenging these and other provisions of PEPRA as, inter alia, an impermissible impairment of their constitutionally protected pension rights. (See *Alameda County, supra,* 9 Cal.5th at pp. 1052–1053, 1063–1065.) In evaluating the argument, we began by agreeing with plaintiffs' premise that PEPRA's amendment of section 31461 imposed new disadvantages relative to pre-existing law. (*Alameda County,* at pp. 1084–1092.) As particularly relevant here, in evaluating plaintiffs' claim of impaired pension rights, our opinion described the changes made by PEPRA to final compensation calculations based on cashed out leave time. We observed that, by adding subdivision (b)(2) and (b)(4) to section 31461, "the Legislature appears to have intended to prevent retiring employees from, in effect, including remuneration earned during *prior* years in the final compensation calculation," as they might have done under prior law. (*Alameda County*, at p. 1062, italics added.) We went on to observe that, as the state had pointed out in that case, the provisions serve the "additional function" (*ibid*.) of addressing the situation we now confront in this case, namely, when employees designate a final compensation year that straddles two calendar years, thereby

potentially doubling the amount of cashed out leave time that may be included as compensation earnable (*id.* at pp. 1062–1063).

*Alameda County* held that these and other impairments were constitutionally permissible, notwithstanding the Legislature's failure to provide offsetting benefits, because they were enacted for the constitutionally permissible purpose of closing loopholes and curbing perceived pension abuses, and because that purpose would have been undermined by requiring the State to provide benefits that make up for the losses. (*Alameda County, supra,* 9 Cal.5th at pp. 1101–1102.) With PEPRA's constitutionality affirmed, county retirement systems proceeded to implement the new statute, giving rise to the controversy now before us.

## II.

The Ventura County Employees' Retirement Association (VCERA) is a public county retirement system established under CERL, which is administered by a board of retirement (Board). Before our *Alameda County* decision, the Board allowed retiring employees to engage in a certain amount of leave cashout straddling: that is to say, if an employee's final compensation period included portions of multiple calendar years, that employee could include cashouts of unused leave time in excess of their annual allowance, subject to other limits not directly relevant here. But in October 2020, in response to *Alameda County*, the Board adopted a resolution to "comply with *Alameda* [*County*]'s directives regarding mandatorily excluded pay items, which includes the PEPRA Exclusions." Tracking section 31461's language, the resolution expressly

prohibited "overpayments" based on the " 'straddling' of years for leave cash outs, which is a 'PEPRA Exclusion.' "

Seeking to settle any uncertainty on this point, VCERA filed a lawsuit seeking a judicial declaration that the resolution was legal. The named defendants included a number of associations representing covered county employees, as well as one retired employee, Leroy Smith, the former county counsel of Ventura County.

Smith filed a cross-complaint seeking a contrary judicial declaration. He had accrued 368.16 leave hours each year based on the annual leave accrual rate governing his job position. The terms of his employment permitted him to redeem or cash out 200 hours of leave time each calendar year. For his retirement, Smith designated October 10, 2019, to October 10, 2020, as his final compensation period. During this period, he cashed out 240 hours of leave time — 40 hours on December 14, 2019, and 200 hours on February 14, 2020. Smith sought a declaration that in calculating his retirement benefits, VCERA was legally obligated to include cash payments for all 240 hours and could not permissibly limit the calculation to the 200 hours he was allowed to cash out in a single calendar year.

The trial court granted summary adjudication in favor of VCERA, relying largely on this court's discussion of the issue in *Alameda County*. The trial court concluded that the statutory text was ambiguous, but, as *Alameda County* had explained, the VCERA's position was consistent with the Legislature's overarching statutory objective of curbing pension spiking.

Two of the defendant associations, the Criminal Justice Attorneys Association of Ventura County and Ventura County

Professional Peace Officers' Association (collectively, "Employee Associations"), appealed. The Court of Appeal affirmed the judgment of the trial court. Like the trial court, the Court of Appeal found ambiguity in section 31461(b)(2) and resolved that ambiguity by reference to the Legislature's purpose. Consistent with *Alameda County*, the Court of Appeal interpreted the provision in light of its purpose to prevent pension spiking and "to comport with 'the underlying concept of compensation earnable, which is intended to reflect pay for work ordinarily performed during the course of a year. [Citation.] A member's compensation earnable during the final compensation period is meant to reflect the *average* pay the retiring employee received.' [Citation.] And, an employee's average pay during this compensation period includes payment for leave cashouts *that is subject to annual limitations*." (*Ventura County Employees' Retirement Assn. v. Criminal Justice Attorneys Assn. of Ventura County* (2024) 98 Cal.App.5th 1119, 1129.) The Court of Appeal thus held that VCERA properly excluded from the compensation earnable calculation compensation for Smith's 40 hours in excess of Ventura County's annual allowance of 200 hours of cashed out leave time.

We granted review to clarify this issue of statewide importance on the proper calculation of retirement benefits for covered public employees.

## III.

As a threshold matter, the parties debate whether we already decided the issue in *Alameda County*. Again, the pertinent passage of the *Alameda County* opinion reads in full: "Prior to PEPRA's amendment, even in counties that limited the

amount of leave time that could be cashed out in a calendar year, employees were able to double the amount of cashed out leave time received during a final compensation year by designating a final compensation year that straddles two calendar years, for example, July 1 through June 30. By cashing out leave time in the second half of the prior calendar year and the first half of the subsequent calendar year, a retiring employee could double the amount of cashed out leave time received in the final compensation year. By limiting the inclusion of cashed out leave time to that 'earned and payable' in a '12-month period,' subdivision (b)(2) and (4) prevent this practice." (*Alameda County*, *supra*, 9 Cal.5th at pp. 1062–1063.)

VCERA argues that this passage makes clear that section 31461(b)(2) prohibits the practice at issue here — i.e., as much as "doubl[ing] the amount of cashed out leave time received during a final compensation year by designating a final compensation year that straddles two calendar years." (*Alameda County*, *supra*, 9 Cal.5th at p. 1062.) The Employee Associations disagree, noting that *Alameda County* resolved questions about the constitutionality of the PEPRA amendments, but did not decide the "specifics of how subdivision (b)(2) applied to different practices among the county litigants." The Employee Associations argue that *Alameda County*'s description of section 31461(b)(2) as curbing so-called straddling practices with respect to leave cashouts was not only unnecessary to the decision but also inconsistent with the plain language of the statute.

We agree with the Employee Associations that we did not definitively decide this issue in *Alameda County* because the

case did not directly present it.  The primary question there was whether section 31461's new limits on the inclusion of certain amounts as "compensation earnable" were changes that impermissibly impaired the contractual and constitutional pension rights of legacy employees.  And although we described the prohibition of the practice at issue here as one of these changes (*Alameda County*, *supra*, 9 Cal.5th at p. 1063), we did not undertake a statutory analysis of section 31461(b)(2) to explain *how* the amendment prevented that practice.  It is therefore appropriate for us to now conduct that analysis, as the Employee Associations ask us to do.  (See *Brown v. City of Inglewood* (2025) 18 Cal.5th 33, 40 [" 'The proper interpretation of a statute is a question of law we review de novo' "].)

But we disagree with the Employee Associations that this statutory analysis changes the conclusion.  Reading the statutory text in light of its purposes, we now confirm what we previously said in *Alameda County*:  Under section 31461(b)(2), the calculation of compensation earnable must exclude any leave cashouts that exceed the relevant annual limits set by the terms of employment.

## IV.

Our inquiry begins with the text of the provision, which we interpret in context, giving the language its ordinary meaning.  (*In re Ja.O.* (2025) 18 Cal.5th 271, 283.)  "If the statutory 'text is unambiguous and provides a clear answer, we need go no further.' " (*Ibid*.)  "Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation, may the court turn to extrinsic aids to assist in interpretation."  (*Murphy v. Kenneth Cole Productions, Inc*.

(2007) 40 Cal.4th 1094, 1103; see *Brown v. Gardner* (1994) 513 U.S. 115, 118 ["Ambiguity is a creature not of definitional possibilities but of statutory context"].)  We may consult other aids, such as the purpose of the statute, legislative history, and public policy.  We also consider portions of the statute in context with both the entire statute and the statutory scheme of which it is a part, giving meaning to every word, phrase, sentence, and part of the act consistent with the legislative purpose.  (*People v. Reynoza* (2024) 15 Cal.5th 982, 989–990.)

Again, section 31461 defines the term " '[c]ompensation earnable' " to mean "the average compensation as determined by the board, for the period under consideration upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay."  (§ 31461, subd. (a)(1).)[5]  The provision then states:  " 'Compensation earnable' does not include, in any case, the following: . . . (2) Payments for unused vacation, annual leave, personal leave, sick leave, or compensatory time off, however denominated, whether paid in a lump sum or otherwise, in an amount that exceeds that which may be earned and payable in each 12-month period during the final average

---

[5]    The term "period under consideration" refers to "the relevant time period under section 31462.1 (or section 31462 if it applies instead)."  (*County of Marin Assn. of Firefighters v. Marin County Employees Retirement Assn.* (1994) 30 Cal.App.4th 1638, 1647.)  Within VCERA, individuals with a one-year period are referred to as "Tier 1" members, while individuals with a three-year period are referred to as "Tier 2" members.

salary period, regardless of when reported or paid."
(§ 31461(b)(2), added by Stats. 2012, ch. 296, § 28.)

The Employee Associations argue that this language plainly forecloses any conclusion that section 31461(b)(2) prohibits the practice of counting as compensation earnable all of the leave cashouts paid to an employee during a final compensation period that straddles multiple calendar years, regardless of any cap on the amount that can be cashed out during a single calendar year. The Employee Associations emphasize that the Legislature did not use the term "calendar year" but instead referred to "12-month period" — a term they contend is "unambiguously defined by the employee's elected final compensation period." Based on that premise, the Employee Associations contend that "an employee may designate a final compensation period that permits that employee *to include all leave cashouts which they have earned in the period they are allowed [to] choose*, with the caveat that the cashout does not exceed that which may be 'earned and payable' during the final compensation period." They insist that "there is nothing in the statute which reasonably subjects it to an employer's calendar-year restrictions on leave cashouts."

On its face, the statute might be read as the Employee Associations suggest. But we are not persuaded that their reading is the only possible reading. The Employee Associations' argument assumes that section 31461(b)(2)'s reference to what is "earned and payable" in "each 12-month period during the final average salary period" must refer to whatever amounts are paid in the very same 12-month period (or, in the case of Tier 2 employees, the three 12-month periods)

selected by the employee as the final compensation period.[6] This is, however, just an assumption; nothing in the plain language of the statute compels this understanding. The text does not, by terms, refer to the final compensation period selected by the employee, but "each 12-month period during" that period. (§ 31461(b)(2).) And as all recognize, the use of the word "payable" connotes something different from "paid"; it suggests a focus not on the mere fact of payment but on the rules that determine when, and to what extent, an amount is "[c]apable of being paid." (Black's Law Dict. (6th ed. 1990), p. 1128, col. 2, italics added [defining "payable"].) So the question set out in section 31461(b)(2) is not how much leave cashout an employee has received during the final compensation period, but how much of that leave cashout was, under the relevant rules of employment, capable of payment in "each 12-month period during" the final compensation period.

While it is linguistically possible to understand the answer to this question as the Employee Associations do, their reading raises questions when considered in the broader context of the statute. Why include the "12-month period" limitation in section 31461(b)(2) at all if the section's measurement period is, as the Employee Associations say, "unambiguously defined by"

---

[6] While section 31461(b)(2) uses the term "final average salary period," the parties and the cases alike have generally referred to a "final compensation period." (See, e.g., *Alameda County*, *supra*, 9 Cal.5th at pp. 1058, 1060; *In re Retirement Cases* (2003) 110 Cal.App.4th 426, 441–442.) Neither party here identifies any material distinction between the terms that is relevant to our consideration of the issue here. We, therefore, use the terms interchangeably.

the final compensation period chosen by the employee? At least for those employees with one-year final compensation periods, the Employee Associations' reading renders the "12-month period" limitation useless; the statute would operate just the same if the words were struck out of the statute. As VCERA puts it, "If the Legislature intended to include in compensation earnable any amount paid during a member's [final compensation period], it could and would have omitted the restriction of each 12-month period," which measures what is "payable" annually as cashed out leave. Whatever conceivable effect the "12-month period" limitation might have for a three-year final average salary period (which, of course, contains multiple 12-month periods), this point gives us pause. Ultimately, we are hard-pressed to conclude that section 31461(b)(2) *unambiguously* includes all leave cashouts an employee is paid during whatever 12- or 36-month period the employee chooses to designate as the final compensation period.

VCERA, by contrast, would understand the phrase "earned and payable in each 12-month period" as referring to the applicable annual cashout limits, as the most pertinent "constraint[s] on the amount of leave time that can be cashed out" during the final compensation period. (*Alameda County*, *supra*, 9 Cal.5th at p. 1096, fn. 31.) As explained above, under the terms of employment, an employee is typically allowed to cash out only a certain amount of unused leave hours each year. These limits are typically based on a calendar year, as they are in this case, but they could also theoretically be based on the fiscal year or, for that matter, any other 12-month period the county employer might elect. In VCERA's reading, only amounts within these annual limits can be considered "payable

17

in each 12-month period" during the final compensation period, in order to count as compensation earnable (§ 31461(b)(2)). The terms of Smith's employment, for instance, allowed him to cash out 200 hours of accrued leave time per calendar year. Thus, even though Smith's designation of a one-year final compensation period straddled two calendar years, VCERA excluded from compensation earnable payment for any leave hours that exceeded the 200-hour allowance applicable "in each 12-month period" during the final compensation period year.

Considering the relevant statutory phrase as a whole, we conclude that section 31461(b)(2) is at least plausibly read as VCERA urges. On this reading, section 31461(b)(2) limits compensation earnable based on leave cashouts an employee receives during the final compensation period to those cashouts that are allowable in any relevant 12-month period, i.e., that is, what the terms of employment prescribe for measuring the period for allowable leave cashouts. Put differently, to the extent that compensation earnable during the final compensation period is intended to reflect a retiring employee's year of compensation for purposes of pension calculations, section 31461(b)(2) limits compensation earnable to those cashouts that occur during the final compensation period selected by the employee — but subject to any annual cashout allowances in place during the relevant time period.[7] This

---

[7] This statutory interpretation would also apply to Tier 2 employees who designate a three-year final compensation period with an annual compensation earnable that is "calculated as an average over three specific years." (*Alameda County, supra,* 9 Cal.5th at p. 1057; see § 31462.) Because there are three "12-month period[s]" that are relevant under section 31461(b)(2),

reading understands section 31461(b)(2)'s "in each 12-month period" language together with the preceding phrase "earned and payable" in a manner that endeavors, as possible, to give meaning to both.

The Employee Associations raise various arguments against VCERA's proposed reading, but none persuades us that the argument is foreclosed by plain statutory text. First, the Employee Associations argue that VCERA's reading founders on the use of the word "during" in the phrase "earned and payable in each 12-month period during the final compensation period." (§ 31461(b)(2).) In their view, the use of the word "during" means that the "12-month period" or periods in question must be wholly encompassed by the final compensation period. But the ordinary usage of the word "during" is not so circumscribed. (See Merriam-Webster Dict. Online (2026) <https://www.merriam-webster.com/dictionary/during> [as of July 27, 2026] [defining "during" as "throughout the duration of" or "*at a point in the course of*" (italics added)]. All internet citations in this opinion are archived by year, docket number and case name at <https://courts.ca.gov/opinions/cited-supreme-court-opinions>.) We see no clear textual reason why a calendar-year, employment-based limit on leave cashouts cannot determine what is "earned and payable in each 12-month period during the final average salary period" even if the calendar-year limits in question are not wholly encompassed by

---

payments for unused leave time must not exceed the annual allowance for "each" (*ibid.*) such period in order to calculate the "average annual compensation earnable" (§ 31462, subd. (a)).

the final average salary period.[8] This reading is, at a minimum, not so implausible as to compel the Employee Associations' contrary approach.

Second, the Employee Associations argue that if the Legislature had wanted to limit the measurement of compensation earnable to a particular period of time, it could have specified as much. They rely, in particular, on provisions governing California's State Teachers' Retirement System (CalSTRS), which specify that "compensation earnable" is measured on the basis of a "school year" running from July 1 to June 30. (Ed. Code, §§ 22115, subd. (a), 22169.) The argument misses the point. No one questions that even after PEPRA, legacy members can continue to designate the 12- or 36-month period used to measure their compensation earnable. The question here concerns the statutory exclusion from "compensation earnable" for leave cashouts that "exceed[] that which may be earned and payable in each 12-month period during the final average salary period." (§ 31461(b)(2).) And because the CalSTRS statute contains no parallel exclusion, it

---

[8] The Employee Associations insist this reading is implausible because it means that there may be multiple relevant limitations in a single calculation. The argument is unpersuasive. If a Tier 1 member designates a straddled period from August 1 of "Year 1" to July 31 of "Year 2," there are two relevant annual limits on the amount of leave that may be cashed out during that time. It is entirely possible to read section 31461(b)(2), as VCERA suggests, as instructing that the amount of cashed out leave may not "exceed that which is earned and payable" in "each" of Year 1 and Year 2.

offers no real help in understanding the meaning of section 31461(b)(2).

Finally, the Employee Associations also argue that our opinion in *Alameda County* not only fails to support, but actually forecloses, VCERA's interpretation of what it means to "exceed[] that which may be earned and payable in each 12-month period during the final average salary period." (§ 31461(b)(2).) As they note, the same "earned and payable in each 12-month period" language in section 31461(b)(2) also appears in a subsequent subdivision, which governs payments made at the termination of employment. (§ 31461, subd. (b)(4).) In *Alameda County*, we concluded that this particular provision of PEPRA likely effected no material change in the law because prior appellate decisions had established that cashouts of unused leave that could be made only upon separation from service did not count as compensation earnable. (See *Alameda County*, *supra*, 9 Cal.5th at p. 1087.) According to the Employee Associations, it follows that section 31461(b)(2), which uses the same language, "cannot be said to work a major change in the way annual leave cashouts are treated by retirement systems if Section 31461, subdivision (b)(4) made no material change in the implementation of CERL." VCERA is therefore wrong to conclude that section 31461(b)(2) imposes new limits on the amount of cashed out leave time that can be included in compensation earnable.

The argument is unpersuasive. Simply because the Legislature used the operative language in section 31461, subdivision (b)(4) to codify certain appellate rulings regarding the payment of termination pay does not mean that the relevant

language, as used in section 31461(b)(2), effected no change with respect to pre-termination cashed out leave time.[9]  *Alameda County* squarely held to the contrary.  (*Alameda County*, *supra*, 9 Cal.5th at p. 1090.)  And in explaining how section 31461(b)(2) changed the law, *Alameda County* described one function of that provision as preventing the practice of avoiding annual limitations on leave cashouts by designating straddled calendar years as the final compensation period.  (*Alameda County,* at pp. 1062–1063.)  The *Alameda County* opinion may not definitively foreclose the Employee Associations' arguments here, but certainly nothing in the opinion offers them any affirmative help.

We acknowledge that VCERA's reading of section 31461(b)(2) may not be the most immediately obvious or intuitive reading of the statutory text.  But it is, at the least, a plausible reading.  Because the statutory text does not unambiguously dictate either result proposed by the parties, we must consider PEPRA's underlying purpose along with other extrinsic evidence to discern the statute's meaning.  (See *People v. Reynoza, supra*, 15 Cal.5th at pp. 989–990; *Murphy v. Kenneth Cole Productions Inc.*, *supra*, 40 Cal.4th at p. 1103.)

Considerations of statutory purpose conclusively resolve the issue in favor of VCERA's interpretation.  As we have

---

[9]  Indeed, *Alameda County* acknowledged that section 31461, subdivision (b)(4) arguably did change the law with respect to certain payments made in anticipation of an employee's retirement, but noted that the argument was immaterial because in that case the change was "largely coextensive" with the changes made by section 31461(b)(2). (*Alameda County*, *supra*, 9 Cal.5th at p. 1087, fn. 26.)

explained (see *ante*, at pp. 6–7), the Legislature's primary motivation in enacting PEPRA was to close loopholes the Legislature perceived as permitting pension spiking by realigning the statute with the "underlying concept of compensation earnable, which is intended to reflect pay for work ordinarily performed during the course of a year." (*Alameda County*, *supra*, 9 Cal.5th at p. 1063.) VCERA's interpretation of "earned and payable in each 12-month period" is consistent with this understanding of the Legislature's purpose. (§ 31461(b)(2).) Because the "calculation required by section 31461 assumes that all employees have worked the same number of days," allowing employees to boost leave hours above the annual allowance restriction to increase compensation earnable "can be viewed as distorting the pension calculation and increasing pension benefits beyond the amount anticipated by the underlying theory of compensation earnable." (*Alameda County*, at p. 1096.) The effect would be to permit employees to increase — sometimes considerably — their amount of compensation earnable, based not on the work they ordinarily perform during the course of a year, but based on the strategic timing of leave cashouts. This is, as we have previously explained, the type of "manipulation of an employee's pattern of work and pay to produce inflated compensation earnable" that PEPRA was designed to address. (*Alameda County*, at p. 1061; see *id*. at pp. 1062–1063.)

The Employee Associations do not seriously dispute the point, except to note that Smith is seeking a modest addition of only 40 hours beyond the 200-hour annual allowance for cashed out leave time. That may be true, but the statutory interpretation question we face here is not so cabined. If the

Employee Associations' reading of the statute is correct, then, as we have previously observed, other employees in CERL plans throughout the state could as much as "double the amount of cashed out leave time received during a final compensation year by designating a final compensation year that straddles two calendar years." (*Alameda County*, *supra*, 9 Cal.5th at p. 1062.) This result is perhaps not so inconceivable as to rank as absurd, but it is quite unlikely the Legislature intended legislation targeted at curbing pension spiking to prohibit PEPRA members from including *any* amount of cashed out leave time from the calculation of pension benefits (§ 7522.34, subd. (c)(5)), and yet allow legacy members to include potentially double the cashout amount.

As VCERA points out, the Legislature that enacted section 31461(b)(2) was also concerned with administrability and the ability of counties to anticipate and meet their funding obligations. (See *Ventura County*, *supra*, 16 Cal.4th at p. 490.) The legislative history recites that "[r]estricting special pay items, such as unused leave allowances, from being added to the base compensation used to determine an employee's retirement benefits also could lower normal costs, to the extent that those pay items were previously factored into payroll assumptions used to develop contribution rates. Eliminating unanticipated spikes in final compensation could reduce the risk of unfunded liabilities for employers." (Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 340 (2011–2012 Reg. Sess.) Sept. 11, 2012, p. 4.) These administrability concerns, too, favor VCERA's reading. VCERA's approach permits counties to better predict their funding obligations under the pension systems, relative to a system under which somewhere between 100 and 200 percent

of the annual limit on leave cashouts may ultimately be counted as compensation earnable, depending on the retiring employee's election.  (See *Sacks v. Oakland* (2010) 190 Cal.App.4th 1070, 1084 [courts should construe statutes "with a view to promoting rather than defeating the general purpose of the statute" and to "reaching *a workable interpretation* that is in accord with *practicality and common sense*" (italics added)].)

Against these considerations of legislative purpose, the Employee Associations insist that, to the extent there is ambiguity in the statutory language governing pension calculations, the provisions must be liberally construed with "all ambiguities [resolved] in favor of the applicant."  (*Barrett v. Stanislaus County Employees Retirement Assn.* (1987) 189 Cal.App.3d 1593, 1603.)  But as our cases have made clear, "such construction must be consistent with the clear language *and purpose of the statute.*"  (*Ventura County*, *supra*, 16 Cal.4th at p. 490, italics added.)   And while the Employee Associations understandably take the position that their members should be permitted to maximize their pension benefits, including increasing the allowable amount of cashed out leave calculated in the final compensation period, their position in this case cannot be squared with the Legislature's overarching purpose in enacting PEPRA, which was to impose limits on these practices that would help to "maintain the integrity of the pension system" and to facilitate " 'its successful operation' " for the benefit of all its members. (*Alameda County*, *supra*, 9 Cal.5th at p. 1095.)

We again emphasize that "there is nothing inherently abusive" about an employee cashing out leave time to the extent

permitted by an employer, even when the employee cashes out the maximum amount in back-to-back years. (*Alameda County*, *supra*, 9 Cal.5th at p. 1063.) But the prospect of employees cashing out leave time under these circumstances cannot be "divorced from their pension consequences." (*Ibid*.) For legacy members, the Legislature has determined the pension consequences of cashing out accrued leave time are acceptable only if such compensation does not exceed what is "earned and payable in each 12-month period during the final average salary period." (§ 31461(b)(2).) As explained above, in light of the statutory purposes underlying the passage of PEPRA, it is unquestionably the reading that makes the most sense. Reading this statutory text in light of the Legislature's purposes in enacting PEPRA, we confirm what we said in *Alameda County*: Section 31461(b)(2) prevents retiring employees who have designated a final compensation period that straddles calendar years from including in compensation earnable amounts of cashed out leave in excess of the applicable annual allowance for leave cashouts. (*Alameda County*, at pp. 1062–1063.)

**CONCLUSION**

We affirm the judgment of the Court of Appeal.

**KRUGER, J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**EVANS, J.**
**BOULWARE EURIE, J.**[*]

---

[*]    Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

VENTURA COUNTY EMPLOYEES' RETIREMENT
ASSOCIATION v. CRIMINAL JUSTICE ATTORNEYS
ASSOCIATION OF VENTURA COUNTY

S283978

Concurring Opinion by Chief Justice Guerrero

I join in the majority's holding that the phrase "each 12-month period" in Government Code section 31461, subdivision (b)(2),[1] should be understood to incorporate applicable annual leave cashout limits pursuant to an employee's terms of employment. (Maj. opn., *ante*, at p. 26.)  I also join the introduction and parts I–III of the majority opinion (*id.* at pp. 1–13) and its discussion of statutory purpose (*id.* at pp. 23–26).  I respectfully disagree, however, with the path taken by the majority to reach its ultimate holding.  The majority acknowledges that its interpretation of section 31461, subdivision (b)(2) "may not be the most immediately obvious or intuitive reading of the statutory text."  (Maj. opn., *ante*, at p. 22.)  I believe this understates the divergence between the statutory text and the interpretation we adopt today.  While I agree the statute should be interpreted in the manner the majority does, I disagree that this interpretation is apparent on the face of the statutory text.

The subdivision at issue provides for the exclusion of leave cashout payments "in an amount that exceeds that which may be earned and payable in each 12-month period during the final

---

[1]  Undesignated statutory references are to the Government Code.

1

average salary period, regardless of when reported or paid."
(§ 31461, subd. (b)(2).)  The majority interprets the phrase "in
each 12-month period" to mean "in *any relevant* 12-month
period." (Maj. opn., *ante*, at p. 18, italics added.)  Typically, a
calendar year will be the relevant 12-month period because
county employees' terms of employment often set leave cashout
limits by calendar year.  But the statute does not contain the
qualifier "relevant." (§ 31461, subd. (b)(2).)  I do not see how the
majority's interpretation is apparent on the face of the text.

The majority also interprets the word "during" such that a
calendar year may be "during" a one-year final average salary
period that straddles two calendar years.  (Maj. opn., *ante*, at
pp. 19–20.)  The majority relies on a dictionary that defines
"during" as " 'throughout the duration of' " or " 'at a point in the
course of.' " (*Id.* at p. 19, italics omitted.)  But the majority does
not explain which of these definitions applies here.  I do not
think either does.  For individual defendant Leroy Smith, the
final average salary period ran from October 2019 to October
2020.  No calendar year was a 12-month period "throughout the
duration of" October 2019 to October 2020, nor was any calendar
year a 12-month period "at a point in the course of" October 2019
to October 2020.  The majority reads "during" to mean *partly*
during, i.e., *overlapping with*, which seems inconsistent with
how the word is ordinarily used.

But I think that the majority is ultimately correct in its
reading because the extrinsic evidence reveals a latent
ambiguity.  A latent ambiguity arises " 'where the language
employed is clear and intelligible and suggests but a single
meaning, but some extrinsic evidence creates a *necessity* for
interpretation or a choice among two or more *possible*

2

*meanings.'* " (*Mosk v. Superior Court* (1979) 25 Cal.3d 474, 495, fn. 18; see also *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 ["the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute"]; *California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340 ["We need not follow the plain meaning of a statute when to do so would 'frustrate[] the manifest purposes of the legislation as a whole' "].)

Here, the purpose of the amendments that created the language at issue "was to circumscribe CERL's [County Employees Retirement Law of 1937 (§ 31450 et seq.)] 'very broad and general definition of "compensation earnable" ' in order to reduce pension ' "spik[ing]," ' the manipulation of an employee's pattern of work and pay to produce inflated compensation earnable during the final compensation period." (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1061 (*Alameda County*).) While the statutory language on its face does not clearly suggest the interpretation that the majority adopts, the purpose of avoiding pension spiking suggests this interpretation, as the example of Smith in this case illustrates.

As mentioned, Smith's final average salary period ran from October 2019 to October 2020. His leave cashout limit was 200 hours per calendar year. He cashed out 40 hours in December 2019 and 200 hours in February 2020. He earned well over 240 hours of leave per year. Taking the text at face value, we might conclude that all 240 hours of leave that he cashed out during his final average salary period should be

included in his compensation earnable because it was all earned and payable during the 12-month period that constituted his final average salary period. But under this interpretation, his compensation earnable would depend on when in 2019 he cashed out his leave. If he had cashed out his leave in September 2019 instead of December 2019, his compensation earnable would be lower. Thus, this interpretation would permit pension spiking because it would allow employees to manipulate their "pattern of work and pay to produce inflated compensation earnable during the final compensation period." (*Alameda County*, *supra*, 9 Cal.5th at p. 1061.)

The majority's interpretation, on the other hand, excludes leave cashouts in excess of the 200 hours that Smith was permitted to cash out in each calendar year. Under this interpretation, it does not matter when in 2019 he cashed out his leave; the 40 extra hours from 2019 are excluded regardless. That is, the majority's interpretation does not permit pension spiking. Under these circumstances, I agree that "[c]onsiderations of statutory purpose conclusively resolve the issue in favor of" the majority's interpretation. (Maj. opn., *ante*, at p. 23.)

Ultimately, I think that the majority's interpretation is what the Legislature intended. When we discern the Legislature's intent, " 'The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' " (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 979; see also *Brown v. Superior Court* (1984) 37 Cal.3d 477, 485 ["However, the legislative purpose will not be 'sacrificed to a literal construction of any part of the act' "].) Therefore, I agree with the majority's interpretation.

For these reasons, I concur in the introduction and parts I–III of the majority opinion, the discussion of statutory purpose in part IV of the majority opinion, and the judgment.

**GUERRERO, C. J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Ventura County Employees' Retirement Association v. Criminal Justice Attorneys Association of Ventura County

_____

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 98 Cal.App.5th 1119
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S283978
**Date Filed:**  July 27, 2026

_____

**Court:**  Superior
**County:**  Santa Barbara
**Judge:**  Colleen K. Sterne

_____

**Counsel:**

Rains Lucia Stern St. Phalle & Silver, Jacob A. Kalinski, Michael A. Morguess and Brian P. Ross for Defendants and Appellants.

Norman Dowler and Michael G. Walker for the Retired Employees' Association of Ventura County, Inc., Regina (Renee) Artman, Scott Barash, Lyn Krieger, Mark Lunn, Roberto R. Orellana, Tracey Frances Pirie, Marty Robinson and Chris Stephens as Amici Curiae on behalf of Defendants and Appellants.

Nossaman, Ashley K. Dunning, Aalia Taufiq, Alexander Westerfield and Jennifer L. Meeker for Plaintiff and Respondent.

Karen Levy and Schuyler Campbell for the Board of Retirement of the Contra Costa County Employees' Retirement Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Hanson Bridgett, Raymond F. Lynch, Judith W. Boyette and Emily J. Leahy for the San Bernardino County Employees' Retirement Association, the Sacramento County Employees' Retirement System, the Mendocino County Employees' Retirement Association and the Kern County Employees' Retirement Association as Amici Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jacob A. Kalinski
Rains Lucia Stern St. Phalle & Silver, PC
16130 Ventura Blvd., Suite 600
Encino, CA 91436
(747) 221-7100

Ashley K. Dunning
Nossaman LLP
50 California Street, 34th Floor
San Francisco, CA 94111
(415) 438-7228